UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 19-10342-RGS

PHILIP N. BEAUREGARD

v.

JOHN MELDON, personally and as
TRUSTEE of 11 WILLIAM STREET
REAL ESTATE TRUST, LLC

MEMORANDUM AND ORDER ON
MOTION FOR SUMMARY JUDGMENT

December 17, 2019

STEARNS, D.J.

On February 5, 2019, plaintiff Philip Beauregard, a New Bedford lawyer, filed this lawsuit against his former client and friend, defendant John Meldon, a New Bedford area businessman now residing in Puerto Rico. The suit names Meldon both personally, and in his capacity as Trustee of 11 William Street Real Estate Trust, LLC. The only real issue, despite the multiple counts, is Meldon's refusal to go through with the sale to Beauregard of the Hiller Building in New Bedford.[1] Meldon moves for

---

[1] Beauregard originally filed suit in the Bristol Superior Court. Having relocated to Puerto Rico, Meldon removed the case to this court on diversity grounds. Beauregard's Complaint asserts the following counts: Count I - breach of contract; Count II - breach of the implied covenant of good faith and fair dealing; Count III - unjust enrichment; Count IV - specific

summary judgment asserting that, despite an exchange of drafts, no perfected Purchase & Sale Agreement (P&S) was executed, thus no binding contract was ever formed. Beauregard disagrees based principally on two email exchanges between the parties and asks the court to compel the sale.

## BACKGROUND

In June of 2018, Meldon had leased the Hiller Building for three years to Beauregard's son Philip Paul (Phil, Jr.) to house an artisanal food business. In August of 2018, when Meldon refused to permit Phil, Jr. to sell beer and wine on the premises, recriminations began. Beauregard sent Meldon the first of a series of angry and accusatory emails ("I am surprised and frankly very pissed at your message to Philip Paul regarding a beer/wine license."). Dkt 31-2 In an effort to resolve the impasse, the parties, directly and through lawyers, discussed various alternatives, including an indemnification agreement underwritten by Beauregard, Phil, Jr.'s purchase of "appropriate insurance," or an outright purchase of the building by the Beauregards. *Id.*

With regard to a potential sale, Meldon valued the Hiller Building at $1.3 million. Beauregard accused Meldon of inflating the building's worth.

---

performance; Count V – misrepresentation; Count VI - promissory estoppel; and Count VII - violation of Mass. Gen. Laws ch. 93A, § 11.

On September 17, 2018, Beauregard, through counsel, wrote to Meldon accusing him of "practicing extortion" and that he "(and Phil, Jr.) will not tolerate this." Dkt #31-3. On September 18, Phil, Jr., through his father, offered $1 million for the property "if [Meldon] financed it at 5% interest."[2] Beauregard added that $1 million "is well over all appraisals that have ever been done on the building . . . and much more than you should be doing for me after years of help and friendship to you." Dkt #31-4. On September 19, 2018, Paul Lynch, Meldon's attorney, replied to Beauregard as follows:

> I don't understand. You offered the protections mentioned in my email: (1) during our conversation you said you had previously offered an indemnity and an opinion letter and (2) when I brought up a concern that the use could expand beyond the 3 or 4 tables in the current plan, you said this could be taken care of in an agreement limiting the use to that contemplated by the plan. I thought John [Meldon's] willingness to accept these terms despite his misgivings was significant progress and would end the matter – it should have at least ended the accusations of bad faith.
> In any case, if these 3 protections are off the table, John asked me to inform you that he would sell the property for $1 million though he is unable to offer financing.

Dkt 32-2.

In an email dated September 20, 2018, Beauregard responded stating:

---

[2] In the emails, Beauregard sometimes refers to himself as the Buyer, and sometimes names himself and Phil, Jr. as the Buyers. Notwithstanding, Phil, Jr.'s name does not appear on Beauregard's October 5, 2018 draft P&S. Dkt 33-5. Similarly, the court notes that Phil, Jr. is not a party to this litigation.

3

> Thanks for your e-mail regarding $1 million price. I am contacting my banking resources to see if we can get favorable terms for financing the purchase.
> Meanwhile ---- can you prepare a draft P&S ---- the bank will certainly want to see one.
> Thanks,
> Phil

*Id.* On September 25, 2018, Meldon wrote back to Beauregard:

> To Phil and Phil Paul:
> The purpose of this letter is to reserve my rights in connection with the sale of alcohol at 11 Williams Street New Bedford. The lease states that the tenants shall use the leased premises "only for the purpose of Business Office, retail space and manufacturing of Artisanal Foods." The retail use contemplated by the lease relates to the retail sale of the artisanal beef jerky manufactured by the tenant. As landlord I dispute that the term "retail sale" includes the sale of items unrelated to the manufacture and sale of beef jerky and I maintain that the sale of alcohol is precluded since it is unrelated to the manufacture and sale of beef jerky. I understand that the tenant has applied for a liquor license. Please be advised that the landlord does not consent to this use and I reserve all of my rights under the lease including the right now or sometime in the future to terminate the lease due to this or any other unauthorized use of the leased premises.

Dkt #34-3 at Ex. A. Beauregard responded an hour later.

> Regarding your 3:47 p.m. email, I am proceeding on the understanding we reached that I and Philip Paul will buy the building for $1M provided we get bank financing.
>
> So I need your draft purchase and sales agreement. Sooner rather than later. Otherwise, I acknowledge that you are reserving all your rights.
>
> So are we.

*Id.* The P&S that Meldon sent to Beauregard on September 27, 2018, through John Holmgren, his real estate counsel, was rejected by Beauregard because it contained no financing or inspection contingencies, and reserved a right of first refusal for Meldon. On October 5, 2018, Arthur DeAscentis, Beauregard's attorney, sent Holmgren a revised P&S that contained contingencies for bank financing and property inspections, but deleted Meldon's demand of a right of first refusal. On October 11, 2018, Holmgren emailed DeAscentis that, "[a]s I expected, Mr. Meldon is unwilling to proceed with the transaction with any contingencies." *Id.* at Ex. C. DeAscentis responded that, while each party "believes he has an agreement," differences remained. DeAscentis went on to opine that Meldon's proposed P&S was "rather atypical" and "would seem to indicate a desire to unwind what should be a fairly straightforward transaction." *Id.* at Ex. D. Despite the absence of a signed P&S, on October 26, 2018, DeAscentis informed Holmgren that Beauregard "expects that he will have financing and environmental inspections completed within the next 30 to 45 days or so, more than ample time to accommodate Mr. Meldon's preferred closing date of January 2019." DeAscentis went on to note that "Phil and his son continue with extensive improvements to the building in anticipation of purchase." *Id.* at Ex. E. On November 5, 2018, DeAscentis "further update[d] Holmgren that "Phil has

applied for a mortgage loan with the Fall River Five Cents Savings Bank and has paid for the appraisal.[3] Capital improvements to the property continue to be made." *Id.* at Ex. F. On December 24, 2018, DeAscentis informed Holmgren that the title exam had been completed, the municipal lien certificates obtained, and a mortgage survey had been ordered. DeAscentis said that he expected final bank financing approval "sometime the second week in January." *Id.* at Ex. H. DeAscentis enclosed standard authorizations for payoffs and requested a proposed deed. On January 8, 2019, Meldon, through counsel, informed Beauregard that he was "not prepared to sell at this time." *Id.* at Ex. I. Beauregard then filed this lawsuit.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,*

---

[3] In his interrogatory answers, Beauregard asserts that he paid $2,500 for the appraisal. When Beauregard complained about the cost of the appraisal, Meldon sent an employee to Beauregard's office with a $2,500 check. However, Beauregard refused the check. Def.'s Statement of Material Facts ¶ 15.

6

477 U.S. 242, 247-248 (1986) (emphases in original). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). In assessing the genuineness of a material dispute, the facts are to be "viewed in the light most flattering to the party opposing the motion." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995).

## DISCUSSION

**Breach of Contract**

The burden of proving the existence of a contract falls to a plaintiff seeking to enforce its terms, in this case attorney Beauregard. *Canney v. New England Tel. & Tel. Co.*, 353 Mass. 158, 164 (1967). While a binding contract can be oral as well as written, see *Central Ceilings, Inc. v. Nat'l Amusements, Inc.*, 70 Mass. App. Ct. 172, 179 (2007), under the Statute of Frauds, an agreement involving the sale of real property is unenforceable unless evidenced by a writing signed by the party to be charged. Mass. Gen. Laws ch. 259, § 1; *Ravosa v. Zais*, 40 Mass. App. Ct. 47, 50 (1996). The writing need not rise to the level of contractual artistry to be enforceable. Rather, "for a writing to satisfy the Statute of Frauds it must contain directly or by implication, all of the essential terms of the parties' agreement." *Simon v. Simon*, 35 Mass. App. Ct. 705, 709 (1994) (the duration of a lease is an

7

essential term that cannot be provided by implication). *See Mass. Gen. Laws* ch. 106, § 2-201, comm. 1 ("All that is required is that the writing afford a basis for believing that offered oral evidence rests on a real transaction."). Multiple writings may also be read together to determine whether the Statute of Frauds is satisfied. *Bresky v. Rosenberg*, 256 Mass. 66, 73 (1926).

It is undisputed that a final P&S for the Hillard Building was never executed (rather two very different drafts were exchanged). Beauregard, however, cites his email exchanges with Meldon on September 19 and 20, 2018, as comprising an enforceable agreement binding Meldon to sell the Hiller Building.[4] Whether these emails contain the material elements of an enforceable contract is a question of law for the court. *Schwanbeck v. Fed.-Mogul Corp.,* 412 Mass. 703, 709 (1992).

"It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.,* 430 Mass. 875, 878, (2000). It is

---

[4] More specifically, Beauregard contends that "[o]n September 19, 2018, through his legal counsel, Meldon offered, via email, to sell Beauregard the Hiller Building for $1 million, the only condition stated was that he would not provide the financing. Beauregard accepted the offer . . . stating that he would check his resources (meaning his bank and financial advisors), which he later did and proceeded to prepare for the sale . . . ." Pl.'s Statement of Facts ¶¶ 27-28.

true that the law does not require perfection. "If the parties have agreed upon all material terms [of the sale], it may be inferred that the purpose of a final document which the parties agree to execute is to serve as a polished memorandum of an already binding contract." *McCarthy v. Tobin*, 429 Mass. 84, 87 (1999). But, the "[c]onstruction and enforcement of the agreement without these essential terms would be futile, and [the court] cannot supply these provisions without writing a contract for the parties which they themselves did not make." *Held v. Zamparelli,* 13 Mass. App. Ct. 957, 962 (1982) (internal citation omitted).

Here it is evident from the negotiations that continued into January of 2019, that the parties had identified the material terms of the transaction as their positions evolved, namely (1) the price (ultimately $1 million), (2) the obtaining of third-party financing (Meldon being unwilling to finance the sale personally), (3) a favorable environmental inspection, (4) a mutually satisfactory P&S;[5] (5) a guarantee of title, (6) a right of first refusal (reserved by Meldon), and (7) an agreed closing date. Of these seven terms and contingencies, only the first, the gross sale price was agreed in the September

---

[5] "The norm in real estate transactions has been that, where the parties sign a writing contemplating the later execution of a purchase and sale agreement, they do not intend to be bound until that time." *Levinson v. LMI Realty Corp.*, 31 Mass. App. Ct. 127, 130 (1991).

19 and 20 email exchange.[6] While it is true that not all terms of an enforceable agreement must be finalized, the parties must have at least progressed beyond "imperfect negotiation" and a "meeting of the minds" must be reached. *Lafayette Place Assocs. v. Boston Redevelopment Auth.*, 427 Mass. 509, 517 (1998). Here neither of these preconditions was met and therefore there is no contract for the court to enforce.

Because no valid contract was formed, it follows that there is no violation of the implied covenant of good faith and fair dealing (Count II) or viable prayer for specific performance (Count IV). *See Durmic v. J.P. Morgan Chase Bank,* 2010 WL 4825632, at *5 (D. Mass. Nov. 24, 2010), citing *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 412 F.3d 215, 230 (1st Cir. 2005) ("[W]here no contract exists, there can be no derivative covenant of good faith and fair dealing.").

**Unjust Enrichment (Count III)**

---

[6] In his October 23, 2018 letter, Beauregard's lawyer perfectly summed up the misalignment of the parties' positions and the imperfect nature of the ongoing negotiations: "Mr. Meldon believes he has an agreement to sell the referenced property to Phil Beauregard with no contingencies [the 9/27/18 draft P&S]. Mr. Beauregard understands there to be an agreement to sell, as well, but not exclusive of the usual contingencies for financing and inspection [the October 3, 2018 P&S]. The agreement that I proposed was, I think you'd agree, typical for commercial transaction . . . ." Dkt 34-3.

Unjust enrichment occurs when a party retains money or property of another "against the fundamental principles of justice or equity and good conscience." *Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.*, 534 F. Supp. 340, 347 (D. Mass. 1982), quoting from 66 Am. Jur. 2d Restitution and Implied Contracts § 3 (1962). However, a claim of unjust enrichment is "not available to a party with an adequate remedy at law." *Ben Elfman & Son, Inc. v. Criterion Mills, Inc.*, 774 F. Supp. 683, 687 (D. Mass. 1991); *see also Kerr v. Vince*, 2010 WL 1416511, at *17; *One Wheeler Road Assocs. v. Foxboro Co.*, 843 F. Supp. 792, 799 (D. Mass. 1994) (common law and statutory damages remedies are adequate remedies at law that preclude unjust enrichment claims). Beauregard's misrepresentation and Chapter 93A claims, whatever their ultimate merit, preclude his equitable claim of unjust enrichment. *See Adrion v. Knight*, 2009 WL 3152885, at *1 n.1 (D. Mass. Sept. 28, 2009) ("[T]he availability of an adequate remedy at law (whether successful or not) precludes an equitable claim of unjust enrichment.").

**Negligent/Intentional Misrepresentation (Count V)**

Beauregard asserts that Meldon "made representations to [him] that [he] would sell the Hiller Building to Beauregard for $1,000,000 . . . [and] these representations were false from the outset." Compl. ¶ 50. To prove a

claim of misrepresentation, "a plaintiff must prove that the defendant (1) in the course of his business, (2) supplies false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information." *Nota Constr. Corp. v. Keyes Associates, Inc.*, 45 Mass. App. Ct. 15, 19-20 (1998). Here the claim fails on the second element, that is, there is no evidence that the $1,000,000 asking price that Meldon tabled was false. Nor could any reasonable jury find that the $1,000,000 offer constituted a naked promise to convey the Hiller Building without any of the usual accouterments integral to a sophisticated real estate transaction.

**Promissory Estoppel (Count VI)**

Beauregard asserts that Meldon "promised to sell him the Hiller Building . . . for $1,000,000, [he] reasonably relied on [the] representations, [which] . . . induced [him] to make numerous expenditures on and improvements to as well as marketing the Hiller Building as a destination." Compl. ¶¶ 55-57. To state a claim for promissory estoppel, the plaintiff must establish that "(1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character

on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise." *Loranger Constr. Corp. v. E.F. Hauserman Co.,* 6 Mass. App. Ct. 152, 154 (1978). Reliance on the promise must have been reasonable. *See Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850 (1995). Although the reasonableness of a party's reliance is typically a fact question, summary judgment is proper where no reasonable jury could conclude that reliance was in fact reasonable. *See Saxon Theatre Corp. v. Sage*, 347 Mass. 662, 666-667 (1964); *Cataldo Ambulance Serv., Inc. v. Chelsea,* 426 Mass. 383, 387 (1998) ("The question whether a party's reliance on a promise by another is reasonable is often a question of fact, but in an appropriate case can present an issue of law. This is especially so when the parties involved are of relatively equal knowledge and sophistication."). As previously observed, no reasonable person, particularly a reasonable lawyer, would interpret an unadorned asking price as the consummatory act in a complex real estate transaction. Consequently, this claim also fails.

**Violation of Mass. Gen. Laws ch. 93A (Count VII)**

In his Complaint, Beauregard alleges that Meldon violated Mass. Gen. Laws ch. 93A, § 11 by "intentionally and willfully breaching [his] agreement" with Beauregard, and "by making false representations to induce

[Beauregard] to make the Hiller Building more valuable solely at [Beauregard's] and his son's expense . . . to profit from [their] hard work, investment, and marketing . . . ." Compl. ¶¶ 61-62. To sustain a claim under Chapter 93A, § 11, the claimant must be engaged in the conduct of a trade or commerce and must suffer a loss of money or property, real or personal, as a result of the use or employment by another person engaged in trade or commerce of an unfair method of competition or an unfair or deceptive act or practice. An act is unfair or deceptive if it is "'within any recognized conception of unfairness' or is 'immoral, unethical, oppressive or unscrupulous' or 'causes substantial injury to consumers (or competitors or other businessmen).'" *Glickman v. Brown,* 21 Mass. App. Ct. 229, 234 (1985) (*abrogated on other grounds abrogated by Cigal v. Leader Dev. Corp.*, 408 Mass. 212, 216 n.8 (1990)), quoting *PMP Assocs., Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 596 (1975).

There are two fatal flaws in the Chapter 93A claim. In the first instance, there was no agreement between Beauregard and Meldon, only an expectation on Beauregard's part that a deal would eventually be reached. "It is not . . . immoral, unethical, oppressive, or unscrupulous – and therefore not unfair or deceptive – to break off incomplete and imperfect negotiations of a commercial agreement. Every deal that goes sour does not give rise to a

[Chapter] 93A claim." *Pappas Indus. Parks, Inc. v. Psarros*, 24 Mass. App. Ct. 596, 600 (1987). Second, Beauregard cannot point to any loss of money or property attributable to Meldon's allegedly unethical conduct. Beauregard admits in his answers to Meldon's interrogatories that he lacks standing to seek damages incurred by a third party (his son, Philip, Jr.) who is alleged to have invested in improvements to the Hiller Building (although some of these appear to have been made for the benefit of his food business). Beyond this, there is no allegation of financial loss beyond the ordinary and expected expenditures incurred in the negotiation of a real estate transaction.[7]

---

[7] When asked, by way of an interrogatory, what damages he claimed to have sustained, Beauregard answered, "Please see Complaint. Additionally, Plaintiff paid a fee of $2,500 for an appraisal of the Hiller Building and incurred $2,646.50 in legal fees from Attorney DeAscentis." Dkt #32-3 – Int. Ans. #9. While the court is not in the business of ferreting out unsubstantiated statements of fact on summary judgment, I can find no monetized references in the Complaint to actual damages or appraisal and attorney's fees.

ORDER

For the foregoing reasons, the court orders judgment entered for the defendant John Meldon, both individually and as Trustee of 11 Williams Street Real Estate Trust.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE